## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| H.M., a minor, by and through | : | Case No. 1:14-CV--64 |
| her guardians and next friends, | : | |
| M.M. and A.M., *et al.*, | : | Judge Barrett |
| | : | |
| Plaintiffs, | : | |
| | : | **FIRST AMENDED COMPLAINT FOR** |
| v. | : | **COMPENSATORY MONETARY** |
| | : | **DAMAGES AND PUNITIVE MONETARY** |
| BOARD OF EDUCATION OF THE | : | **DAMAGES** |
| KINGS LOCAL SCHOOL DISTRICT, | : | |
| *et al.*, | : | **[JURY DEMAND]** |
| | : | |
| Defendants. | : | |

## PRELIMINARY STATEMENT

1. The Plaintiffs are five multi-handicapped children and their parents and guardians. These children are the most vulnerable members of our society. They love and hurt just like anyone else. The children are unable to defend themselves physically or verbally. Nevertheless, as described in this Complaint, the Kings Local School District ("Kings") and its employees and officials unlawfully, injuriously, and punitively abused and neglected the children, created a harassing, intimidating, and discriminatory environment, failed to notify proper authorities, and then intentionally and in bad faith covered-up their unlawful conduct by refusing to inform the children's parents and guardians.

2. While students at a school within the Kings Local School District, the Plaintiffs here who are also minors were subjected to gratuitous and entirely unjustified punitive physical and/or emotional violence and abuse at the hands of their teacher, with such abuse either deliberately ignored or condoned by those responsible for supervision and oversight at Kings.

The violence and abuse had no relationship whatsoever to any legitimate educational or other objective but rather was nothing more than intentional painfully injurious conduct toward the defenseless multi-handicapped children and their misled families.  The teacher's conduct toward the children, and Kings' and the Defendant principals' acquiescence and cover-up, were brutal and inhumane. The Plaintiff children have significant communication deficits and were unable to explain the teacher's abuse to their families. The Defendants' unlawful conduct identified in this Complaint was not in furtherance of efforts to control or discipline students or maintain order or control in the classroom.   Instead, the injuries to the Plaintiffs were caused by the Defendants' conscious and flagrant indifference to the Plaintiffs' rights.

3.     As the United States Court of Appeals for the Ninth Circuit recently held, *en banc*, in *Payne v. Peninsula School District, et al*., 653 F.3d 863, 876 (9th Cir. 2011) (*en banc*), *cert. denied*, 132 S.Ct. 1540 (2012): "[W]e find no merit to the distinction we have previously drawn between physical and non-physical injuries . . . . [T]here is no reason to treat constitutional violations that do not result in physical injuries differently under the exhaustion provision."

4.     The *Payne* court further held:   "The claim asserted here—for knowing and intentional infliction of excessive force—is cognizable under the Fourth Amendment and exists separate and apart from the denial of a FAPE irrespective of the fact that the alleged excessive punishment took place in a special education classroom . . . ." 653 F.3d at 880.

5.     Plaintiffs bring this action to seek and obtain retrospective monetary compensatory and punitive damages for the intentional violation of their rights under the United States Constitution, federal law, and state law, and for their permanent and significant injuries. Just as the star quarterback or homecoming queen is entitled to seek retrospective monetary

compensation for pain and suffering and other injuries caused by, for instance, being duct-taped into a chair and secluded in the bathroom or being forced to crawl on the floor into the bathroom or having to observe others being so abused, so the Plaintiffs are entitled to seek this relief in this Court at this time.

6.     The United States Court of Appeals for the Ninth Circuit emphasized in *Payne*: "[A] student who had *no disability* . . . would be able to challenge the constitutionality of his teacher's confinement procedures without first resorting to administrative procedures.  The student could simply advance a § 1983 claim alleging violations of his constitutional rights. No exhaustion would be required if a *disabled* student would be able to make out a similarly meritorious constitutional claim . . . ."  653 F.3d at 878 (emphasis added).

## JURISDICTION and VENUE

7.     This Court has jurisdiction over this matter under 28 U.S.C. § 1331 because of the federal claims involved including those arising under the United States Constitution and 42 U.S.C. § 1983.   The Court has supplemental jurisdiction over state law claims under 28 U.S.C. § 1367.

8.     Venue is proper in this court pursuant to 28 U.S.C. § 1391(b), as the Defendants reside within this District, the Defendants transact business within this District and the conduct complained of occurred within this District.

## PARTIES

9.     H.M. is a minor child who, at all relevant times herein, resided in Warren County, State of Ohio, and attended Columbia Elementary School ("Columbia"), a school operated and maintained by Kings.

10.     M.M. and A.M. are H.M.'s mother and father.  During all relevant periods of time herein, they resided in Warren County, State of Ohio.

11.     S.P. is a minor child who, at all relevant times herein, resided in Warren County, State of Ohio, and attended Columbia, a school operated and maintained by Kings.

12.     R.P. and J.P. are S.P.'s mother and father.  During all relevant periods of time herein, they resided in Warren County, State of Ohio.

13.     M.J. is a minor child who, at all relevant times herein, resided in Warren County, State of Ohio, and attended Columbia, a school operated and maintained by Kings.

14.     M.J. is M.J.'s legal guardian.  During all relevant periods of time herein, they resided in Warren County, State of Ohio.

15.     D.A. is a minor child who, at all relevant times herein, resided in Warren County, State of Ohio, and attended Columbia, a school operated and maintained by Kings.

16.     J.A. and M.A. are D.A.'s mother and father.  During all relevant periods of time herein, they resided in Warren County, State of Ohio.

17.     J.K. is a minor child who, at all relevant times herein, resided in Warren County, State of Ohio, and attended Columbia, a school operated and maintained by Kings.

18.     L.W. is J.K.'s legal guardian.  During all relevant periods of time herein, they resided in Warren County, State of Ohio.

19.     The Board of Education of the Kings Local School District is an entity operating under the laws of the State of Ohio and is authorized to sue and be sued as an entity for its acts and those of its agents and employees.  Kings has its primary place of business in Warren County, Ohio.  At all relevant times herein, Kings had authority over how H.M. was treated while she attended Columbia.

4

20.     During a portion of the relevant periods of time herein, Jerry Gasper was the principal of Columbia and, in such capacity, was responsible for the training and supervision of the staff at Columbia, including Amanda Kitcho, the teacher of H.M., S.P., M.J., D.A., and J.K. Gasper is being sued in both his official and individual capacities.  Upon information and belief, Defendant Gasper was a final policymaker for Kings with regard to directing and controlling Kitcho's conduct, reporting her abuse to authorities, and covering up the behavior.

21.     During a portion of the relevant periods of time herein, Shelly Detmer-Bogaert was the principal of Columbia, having succeeded Gasper in that position and, in such capacity, was responsible for the training and supervision of the staff at Columbia, including Amanda Kitcho, the teacher of H.M., S.P., M.J., D.A., and J.K.  Detmer-Bogaert is being sued in both her official and individual capacities.  Upon information and belief, Defendant Detmer-Bogaert was a final policymaker for Kings with regard to directing and controlling Kitcho's conduct, reporting her abuse to authorities, and covering up the behavior.

22.     Amanda Kitcho was, at all relevant times, H.M.'s, S.P.'s, M.J.'s, D.A.'s, and J.K.'s elementary school teacher hired, trained, and supervised by Kings.  Kitcho is being sued in both her official and individual capacities.

23.     All actions and omissions herein by all Defendants were done under the color of state law.

## FACTS

24.     H.M. is a minor child.

25.     H.M. has the physical condition of CDG 1a (Congenital Disorders of Glycosylation.

26.     Children with CDG 1a have limited life expectancy and, thus, every moment of time is priceless.

27.     H.M. has the physical condition of cerebellar hypoplasia.

28.     Individuals with cerebellar hypoplasia, including H.M., have symptoms that include reduced muscle tone, poor fine motor skills, and intellectual disability.

29.     H.M. uses a Rifton walker and ankle-foot orthotic for mobility, a photograph of which is attached as **Exhibit A-1**.

30.     When stationary, H.M. also uses a Rifton Compass Chair (or similar device), a photograph of which is attached hereto as **Exhibit A-2**.

31.     The Rifton Compass Chair has certain bodily support features, including a seatbelt, which compensates for H.M.'s insufficient muscular development which does not allow H.M. to sit in a regular chair.  As a general matter, if unassisted or unaided by the Rifton Compass Chair, H.M. would fall to the floor.

32.     H.M. sometimes has rolling eye seizures and stroke-like symptoms.

33.     H.M. had been toilet trained but because of limited muscle tone has to promptly use the toilet when necessary.

34.     In her parents' words, H.M. "has never allowed her limitations to dictate what she may do" and she lives her life to her fullest extent possible.

35.     Children with CDG 1a often have a keen sense of awareness of their environment and, despite their multiple handicaps, they tend to have joyous, friendly and warm personalities. They respond well to personal attention and have a very good sense of their relationships with others, especially when treated with care.

36.     Without intervening trauma, either physical or emotional, children with CDG 1a do not regress in their gradually increasing abilities.

37.     Children, including H.M., with CDG 1a generally have engaging and warm personalities.

38.     Children, including H.M., with CDG 1a are generally sensitive and if they regress it is due to external trauma.

*H.M. is placed in Kitcho's classroom and becomes subject to abusive targeting by Kitcho*

39.     For the 2010-2011 school year, H.M. was enrolled in Columbia Elementary School, a school operated by the Board of Education of the Kings Local School District.

40.     A few years prior to the 2010-2011 school year, Kings had assigned Kitcho as the teacher of a multi-handicapped classroom at Columbia.

41.     For the 2010-11 school year, Kings initially placed H.M. in a regular classroom but eventually moved H.M. into Kitcho's multi-handicapped classroom at Columbia.

42.     H.M. was in Kitcho's classroom from November 2010 to May of 2011.

43.     At the time that H.M. was placed into Kitcho's multi-handicapped classroom at Columbia, that classroom was already previously filled to lawful capacity with multi-handicapped students. Kings official Sandy Bateman expressly informed Defendant Gasper of that limitation.

44.     As Kitcho's multi-handicapped classroom was already filled to lawful capacity with multi-handicapped students, the placement of H.M. into Kitcho's multi-handicapped classroom was in contravention of laws and regulations applicable to Kings and Columbia.

45.     Throughout her tenure as a teacher at Kings, Kitcho regularly screamed at her students, including the Plaintiffs herein who are multi-handicapped minors, intentionally

provoked and startled them into escalating behaviors, threw their possessions into the trash, walled them in behind dividers in the classroom, took food from the their lunches, deprived them of snacks, lied to them, and otherwise both ignored and abused the multi-handicapped children in her classroom.

46.     During the entire period of time that H.M. was in Kitcho's classroom, *i.e.*, from November 2010 to May of 2011, H.M. was specially targeted by Kitcho for abuse.

47.     A classroom aide stated that H.M. was "good as gold" when Kitcho was not around to antagonize H.M.

48.     During the 2010-2011 school year, Kitcho stated that she "hated H.M."

49.     During the 2010-2011 school year, Kitcho often screamed at H.M.

50.     During the 2010-2011 school year, Kitcho forced H.M. to crawl into the bathroom in order to seclude H.M. while Kitcho continuously screamed at H.M.

51.     Kitcho's forcing H.M. to crawl into the bathroom in order to seclude H.M. and her continuous screaming at H.M. was done in the presence of other Kings' employees.

52.     Kitcho forced H.M. to crawl into the bathroom notwithstanding that A.M., H.M.'s mother, had previously informed Kitcho that, for medical reasons, H.M. was not permitted to crawl but, rather, was supposed to use her Rifton Walker at all times.

53.     An aide in Kitcho's classroom reported that Kitcho stated, with respect to H.M., that, "She's crawling around.  I'm not putting her in that damn thing every time she's got to move from center to center.  She can crawl."

54.     In addition to the crawling in the classroom noted above, a second long-term Kings' employee (a librarian) reported to the Columbia administration Kitcho's conduct of forcing H.M. to crawl into the bathroom in the hallway outside the classroom.  This librarian

characterized H.M. being forced to crawl across the floor as looking like "a dying dog trying to get to the side of the road. That's how pathetic it looked to me."

55.     A classroom aide gave the bathroom the appellation of "the torture chamber."

56.     On at least one occasion, Kitcho "walled off" H.M. in the classroom using partitions or dividers so as to isolate her from the other students, teachers and aides.

57.     Kitcho intentionally provoked and ridiculed H.M. and other multi-handicapped children into escalating behaviors. Kitcho said doing so was her "perverse pleasure."

58.     Kitcho threatened to take H.M.'s possessions, call her mother, and otherwise deprive H.M. of rewards.

59.     Kitcho did not allow her classroom aides to read H.M.'s education plans and learn what was medically necessary for H.M.

60.     Kitcho deliberately misrepresented data she provided to H.M.'s parents.

61.     On one occasion, Kitcho allowed H.M. to attend the library without an aide, ignoring the librarian's request for assistance and resulting in H.M. subsequently falling and hitting her head.

62.     The Kitcho classroom had a bathroom in it to facilitate attending to the toileting needs of the children in her classroom. The door to the bathroom opened out into the classroom.

63.     In perhaps the most outrageous pattern of conduct perpetrated by Kitcho against H.M., she would frequently slide H.M., seat-belted in her Rifton Compass Chair, into the bathroom, close the door, and leave her in there for periods of time for punitive reasons unrelated to any possible pedagogical purpose. There, H.M. would cry and scream. This would at times continue for prolonged periods of time.

64.     Eventually, H.M. learned how to unbuckle her chair seatbelt.  While locked in the bathroom, H.M. would unbuckle her seatbelt, fall to the floor, crawl to the door of the bathroom. Upon reaching the door, H.M. would pull herself up on the frame and door knob, open the door, and then try to come back into the classroom.

65.     On occasions, to prevent H.M. from coming back in the classroom, Kitcho would stand in front of the door with H.M. attempting to exit, pushing on the door, and screaming and crying to get out.

66.     Kitcho would let H.M. scream until she was too tired to scream any more.

67.     One day, tiring of this routine, Kitcho used duct tape to rig the seatbelt on the Rifton Compass Chair to make it impossible for H.M. to break free.  Kitcho then slid H.M. into the bathroom in the classroom, and left her in the chair, crying and screaming for a significant period of time.

68.     During the course of such actions by Kitcho, H.M. was screaming at the top of her lungs:  "I have to go potty; I have to go potty . . . ."

69.     An aide said that Kitcho acted like a ten year old and screamed back and forth with H.M:  "I hate you. I hate you."

70.     Defendants acted maliciously and with deliberate indifference to the rights of H.M. and severely injured her.  At least one teacher's aide in Kitcho's class repeatedly reported the misconduct of Kitcho to Kings' policymakers responsible for Kitcho.  However, for a prolonged period of time and following multiple reports of such misconduct, no investigation was conducted and no corrective action was taken to protect the children in Kitcho's classroom, including H.M. Furthermore, the Defendant principals instructed the aide to ignore the misconduct of Kitcho and to allow it to continue.  On at least one occasion, assistant principal

Detmer-Bogaert personally witnessed the abuse of H.M. but, instead of acting on such knowledge, she left the classroom and proceeded as if nothing untoward had occurred, failed to report the abuse to authorities, failed to report the abuse to H.M.'s parents. The Defendant principals thus allowed the abuse of H.M. to continue and allowed it to go forward as a matter of the policy, practice and procedure of Kings.  As a result of these and other acts and omissions, not only did Kings fail to properly hire, train, and supervise its employees, it then tried to cover-up its culpability and ratified the misconduct of Kitcho against H.M.

71.    Despite knowing of the misconduct of Kitcho against H.M., Kings did not inform H.M.'s parents of such misconduct by Kitcho against H.M.


*The Defendants Unlawfully Abused All the Plaintiffs Who Were Students of Kitcho*

72.    Each Plaintiff who was a student in Kitcho's classroom was continuously and repeatedly forced to observe Kitcho emotionally and physically abuse other children, in addition to themselves, both in the classroom and outside the classroom.   However, the children were unable to explain that harmful situation to their parents and guardians.  Each Plaintiff child became fearful and anxious and was psychologically injured.  Kitcho's classroom was a hostile environment for each of them as they helplessly received and observed Kitcho's abuse.

73.    None of Kitcho's conduct was ever mentioned to, or even remotely contemplated by, the parents and guardians of the Plaintiff children.  Kitcho's conduct was gratuitously punitive and known only to herself, Kings' employees and officials, and the Plaintiff children who were unable to defend themselves or report Kitcho's unlawful conduct.

74. Kitcho's conduct had no conceivable educational or pedagogical purpose whatsoever but rather was motivated solely by her own personal vindictiveness toward the Plaintiffs.

75. S.P., M.J., D.A., and J.K. were also physically and/or emotionally abused by Kitcho yet Kings also did not inform their parents or guardians of such misconduct.

76. S.P. is a child with Down syndrome, severe childhood apraxia of speech, severe receptive and expressive language disorders, and other delays.

77. As a result of Kitcho's conduct S.P. has developed an extreme aversion to individuals who behave in an autistic manner and she is not able to be in their presence. S.P.'s ability to participate in job training, camps, Special Olympics, and other educational activities for multi-handicapped children has been severely restricted.

78. M.J. has cerebral palsy and significant challenges in the areas of cognition, communication, fine and gross motor skills, adaptive needs, and other delays.

79. D.A. has multiple disabilities causing challenges in the areas of communication, fine and gross motor skills, adaptive skills, and other delays.

80. J.K. has cerebral palsy, a seizure disorder, and various developmental delays.

81. Kitcho physically turned M.J. around for absolutely no reason.

82. Kitcho openly ridiculed M.J.'s attire.

83. Kitcho often yelled at D.A.

84. Kitcho took D.A.'s and S.P.'s snacks.

85. Kitcho would often yell at S.P.

86. Kitcho made S.P. stand in front of the class for extended periods of time and make the other children wait until S.P. would perform a task to Kitcho's liking.

87. Kitcho intentionally neglected J.K.'s toileting needs and sent her home dirty.

88. Kitcho allowed J.K. to sit in her own vomit during seizures while Kitcho sat at her computer and ignored J.K. L.W., J.K's guardian directly complained to Defendant principals about Kitcho's conduct.

89. Kitcho intentionally knocked a table into the mouth of a student.

90. Kitcho intentionally pushed a student during a camp outing.

91. Kitcho antagonistically and physically pushed one of the students in her class during an event outside the school and in front of the other students. The more that child screamed the more S.P. cried.

92. The behavior of the Plaintiffs who were students in Kitcho's classroom regressed due to Kitcho's abuse.

93. D.A.'s behavior changed in significant adverse ways during the time she attended Kitcho's class. D.A. loved attending school prior to Kitcho's class but then she fought attending school during that time frame and would hit J.A. and M.A. and throw things at them. D.A. would lay on the floor, refuse to move, and bang her head on the floor

94. D.A. significantly regressed while in Kitcho's class.

95. When M.A. expressed her concerns to the principals of Kitcho's school about the problems she was having with D.A. during the time D.A. was in Kitcho's class the principals ignored M.A.'s concerns.

96. The Plaintiff children became very anxious and depressed and began destructive behaviors due to their time in Kitcho's classroom. They developed an aversion for school attendance. They cried more. Toileting accidents increased. The children's communication diminished. Abnormal sleep patterns developed such as awakening and not being able to sleep alone. Whether directly provoked by Kitcho or indirectly provoked by having to observe

Kitcho's verbal and physical abuse of others, the Plaintiff children suffered immediate and longstanding emotional pain.

97.     Kitcho previously had another child in her class that she provoked just like she provoked H.M. and "he just went ballistic . . . and then she put him in the back of the room and she put . . . cardboard dividers around him and she[] lock[ed] his chair so he couldn't move . . . and he'd be all walled in and he'd scream and he'd scream . . . ."

98.     Kitcho blamed the children for their regressive behaviors.

99.     Most of the abusive conduct by Kitcho towards her students, including the Plaintiffs who were students in her classroom, was done in a manner and location where the other students in the classroom, including the pertinent Plaintiffs herein, could observe and hear such abusive conduct.

*Reports of Kitcho's Behavior Are Provided to Kings Administration*

100.     On at least one occasion while H.M. was in the bathroom crying and screaming to be let out, Defendant Detmer-Bogaert, the assistant principal of Columbia at that time, came into the classroom. The abuse was too obvious for her not to have seen. Rather than intervene, she exited the classroom, allowing the abuse to continue that day and beyond.

101.     Kings administration received multiple, specific, written and oral reports of Kitcho's abuse of students under her control over a period of more than a year from more than one member of their staff.

102.     Specifically, a teacher's aide in Kitcho's classroom repeatedly reported Kitcho's misconduct to various principals at Columbia.

103.     The Columbia principals had final authority to remedy the problems but Defendant Gasper simply advised the aide to not worry about it.

104. The foregoing teacher's aide was the most persistent about reporting the problems.

105. That teacher's aide eventually resigned her position and informed the then principal at Columbia, Defendant Detmer-Bogaert "I no longer want to feel ashamed that I went to work and watched kids being mistreated. My lead teacher [Kitcho] goes against everything that we learn each summer at our aide training and lacks all the qualities that are found in a decent and caring teacher."

106. The teacher's aide who resigned wrote in her resignation letter to principal Detmer-Bogart: "I can no longer stand by and be a casual observer. I love those kids and know that they deserve better than what they are getting, and every day that I watch, I feel as guilty as if I were the abuser myself."

107. A second teacher's aide in Kitcho's classroom reported to the Defendant principals that Kitcho treated H.M. inappropriately in different ways by, for example, yelling at H.M. for no reason, unreasonably and intentionally punishing H.M. for no reason, and physically restraining H.M. by leaning across her and pushing her down.

108. One of the teacher's aides characterized H.M. as "evil."

109. A Kings' teacher stated that it was her opinion that the Defendant principals did not want to "hear anything more and we just moved on" when she informed the principals how Kitcho had treated the multi-handicapped children in the years prior to H.M.'s placement in Kitcho's classroom.

110. The Columbia librarian regularly complained to Defendant principals that the students in Kitcho's classroom were not being properly treated and supervised.

111.    The librarian believed that "Kings is sweeping this under the carpet."  In fact, the librarian stated "I'm receiving all kinds of 'threatening' innuendos from my employers."  She emphasized:  "I cannot share any information with regards to 'the case.'"

112.    Prior to the 2010-11 school year, two aides in Kitcho's classroom expressed concerns to principal Gasper regarding Kitcho's adverse treatment of her students.  Gasper told one of the aides that Kitcho "went to college for this; she knows what she's doing; you're just the aide so you kind of follow the lead . . . ."

113.    Kitcho's injurious conduct against the Plaintiff children was malicious, reckless, and in bad faith.  Her conduct was beyond all possible bounds of decency and was atrocious and utterly intolerable in a civilized community.

114.    The Defendant principals' conduct was reckless and indifferent and allowed a known risk of injury to the Plaintiff children to continue unabated.

*Kings finally acts*

115.    After seven months of mistreatment and torture of H.M. by Kitcho (and more than four and one-half school years of Kitcho as the Columbia special education teacher), matters relating to Kitcho's abusive behavior finally came to a head.

116.    Ultimately, the teacher's aide complaining most persistently about the abusive conduct of Kitcho towards her students resigned due to the inaction by Kings with respect to Kitcho.  Soon thereafter, these actions followed which finally prompted a response by Kings:

a.    Upon confirming her resignation with Shelley Detmer-Bogaert on January

6, 2012, the teacher's aide threatened to take the information to the district

superintendent, the board of education and the media.

b.      The teacher aide's husband, who was himself an education professional in another district, personally wrote a letter to Kings Superintendent Valerie Browning within a week of that resignation demanding action.

c.      Then, the teacher aide's husband personally came and met with the Kings Board of Education about the problems with Kitcho and demanded that they be addressed.  The Board adjourned into executive session rather than let the matter be publicly aired.

117.    As a result of those demands and in the face of the scandal reaching law enforcement or the media, Kings finally began a process to put an end of the misconduct and/or to terminate Kitcho.

118.    As part of its belated investigation, Kings conducted several depositions of various staff and administrators in Kings, including the following individuals:

a.      Jane Schnee, a teacher's aide at Columbia, on  January 18, 2012;

b.      Defendant Shelley Detmer-Bogaert, the principal at Columbia, on January 23, 2012;

c.      Defendant Jerry Gasper, the former principal at Columbia, on January 23, 2012;

d.      Barb Garisch, a teacher's aide at Columbia, on January 23, 2012;

e.      Rita Kozlowski, a teaching/special needs assistant at Columbia, on January 23, 2012;

f.      Julia Kurtz, the media specialist/librarian at Columbia, on January 23, 2012;

g.      Robin Magness, the occupational therapist for Kings, on January 23, 2012; and

h.      Sally Reinders, a teacher's aide at Columbia, on January 23, 2012.

i.      Jennifer Neena, a teacher's aide at Columbia.

119.    Present at these depositions were (i) Kings' attorney Bill Deters; (ii) the deponent; (iii) one or two union representatives representing Kitcho; and (iv) Assistant Superintendent Tina Blair.

120.    In violation of the clear requirements of O.R.C. §2151.421, neither the administration nor any Kings personnel reported the abuse by Kitcho to law enforcement authorities until the librarian finally reported such abuse to the Warren County Sheriff's Office on or about February 3, 2012.

121.    Defendant Detmer-Bogaert later falsely told S.P.'s parents that Kitcho's abusive conduct was not the reason Kings allowed Kitcho to resign with pay. Detmer-Bogaert subsequently refused to provide information about Kitcho's abusive conduct.  In fact, Detmer-Bogaert falsely assured S.P.'s parents that Kitcho's abuse did not involve S.P.

122.    From February 9, 2012, through end of March 2012, the Child Abuse Unit of the Warren County Sheriff's Office conducted its investigation of the misconduct.

123.    At the conclusion of that investigation, the Warren County Prosecutor's Office determined not to criminally indict Kitcho for felony charges.  The Warren County Prosecutor's Office also concluded not to criminally prosecute Kings administrators for their failure to report the abuse as required by O.R.C. §2151.421.

124.    However, the Warren County Prosecutor's Office did issue a statement, as follows:

> [It] was quite obvious that Ms. Kitcho was extremely mean spirited, verbally abusive and cruel toward these handicapped students and has no business teaching handicapped children.

125.    An investigation of Kitcho has also been undertaken by the Ohio Department of Education.

126.    Kings never reprimanded Defendant Gasper, Defendant Detmer-Bogaert, or any other official or employee for their failure to timely report Kitcho's abuse to appropriate authorities.

127.    Kings reportedly retaliates against families of multi-handicapped children who actively advocate for their children.

*Termination of employment of Kitcho*

128.    Prior to the 2010-11 school year, Kitcho said to an aide: "I may not be back to this hell hole anyway."

129.    At the conclusion of Kings' investigation of Kitcho, Kings negotiated with her an agreement whereby she would resign, receive a severance payment in the amount of the remaining balance on her contract, receive no negative notation in her personnel file, and, in fact, receive a letter of recommendation that would extol her skills as a teacher and the favorable terms of her discharge.  A copy of the separation agreement is attached hereto as **Exhibit B** and the recommendation letter is attached hereto as **Exhibit C**.

*Failure to inform parents and nondisclosure of abuse committed by Kitcho*

130.    From the beginning of the abuse of the Plaintiffs who were students in Kitcho's classroom through the investigations conducted by Kings, the Warren County Sheriff's Office, the Warren County Prosecutor's Office and the Ohio Department of Education, none of the Defendants informed any of the students' parents either of the abuse of their child/ward or of the multiple pending investigations relating thereto.

131.    The Defendant principals knowingly acquiesced in Kitcho's unlawful conduct. The principals knew about the nature and scope of Kitcho's conduct and the risk that it would continue yet failed to properly address and prevent it.

132.    When Defendant Detmer-Bogaert informed Kings' Superintendent Valerie Browning that Kitcho's aide had resigned and Detmer-Bogaert inquired how to proceed, Browning responded:  "Worries me as I'm sure it does you!"

133.    When J.P., for example, inquired of Defendant Detmer-Bogaert about the status of her daughter's classroom after Kitcho was provided leave with pay Detmer-Bogaert responded to J.P: "I will tell you that Amanda [Kitcho] is ok, she is just out on leave."

134.    Kings' Superintendent Browning subsequently approved a letter provided by Kings to the parents of children in Kitcho's classroom that continued the cover-up and instead stated:  "I want to let you know that at this point in time, I do not have a set return date for Mrs. Kitcho."

135.    After hearing about the ongoing Kings' cover-up, the Columbia librarian wrote to Defendant Detmer-Bogaert:  "I hope it's not accurate that you claimed, 'Nobody has ever told you about these kinds of things before.'  I specifically came to you last year and shared with you that this teacher [Kitcho] had a child who couldn't walk—literally use her arms to crawl to the bathroom.  I subsequently found out—shutting this child in the bathroom was the *disciplinary*

*norm* [emphasis in original].  I also sent an email with regards to the same child falling and hitting her head in the library—a day when no aide was sent to accompany her.  I have witnessed a number of other incidents too.  Last year when . . . [an aide] spoke with [Defendant] Jerry [Gasper] he essentially 'blew up' and told her he had never heard of any complaints like this before.  I find it strange that nothing was ever noted anywhere especially something which is so discerning?  The other reason you might find it unbelievable that this has occurred is because AK [Amanda Kitcho] lies—and she lies to you about many things . . . . [Y]ou have two intelligent adults . . . telling you what has been witnessed.  What mother could ever witness these kinds of things and not do something?"

136.    Kings asserts that they have a policy, attached hereto as **Exhibit D,** which gives the Kings Administration the unbridled discretion of whether to inform the parents or legal guardian of an abused child or of an investigation relating to abuse of their own child.

137.    Defendant Detmer-Bogaert perpetuated the cover-up in a communication to parents of a child in Kitcho's classroom:  "I apologize that I have not had much information to share about the current situation in . . . [the] classroom."

138.    Kings has also published a second policy that expressly forbids informing the family, including the parents or legal guardian, of any child suspected of being abused.  A copy of that policy is attached hereto as **Exhibit E.**

139.    On information and belief, this second policy, *i.e.,* **Exhibit E**, was promulgated to at least some staff members at Kings.

140.    Following the secret investigations conducted by the Kings administration and attorneys and the parallel investigations by the Warren County Sheriff's Office, the Warren County Prosecutor's Office and the Ohio Department of Education, the abuse by Kitcho towards

<u>Plaintiffs who were students in Kitcho's classroom was still unknown to any of those students'</u>
<u>parents or guardians.</u>

141. Ultimately, a citizen activist in the Kings district learned of the abuse occurring within the walls of Columbia. On May 7, 2012, a request for public records relating thereto was made on her behalf. A copy of the request is attached hereto as **Exhibit F**.

142. That records request ultimately resulted in the public release of a significant number of documents and references to the depositions that would yield detailed information on the abuse of H.M. by Kitcho.

143. However, Kings refused to release the transcripts showing the detail of the abuse of the children in Kitcho's classroom.

144. After considerable negotiations to obtain the depositions, the citizen activist filed suit at the Ohio Supreme Court to obtain the records in question in a case styled *State of Ohio ex rel. Kim H. Grant v. Board of Education of Kings Local School District, et al.*, Ohio Supreme Court Case No. 2013-0126.

145. Finally, on or about May 29, 2013, Kings provided a redacted version of the records and on or about July 12, 2013, after releases were signed by the parents of a number of children abused by Kitcho, Kings released versions of the depositions which were less redacted.

146. It was only concurrent with the release of the transcripts that Kings finally notified the parents of the abused children what had occurred in the classroom under the control of Kitcho.

147. The parents of the Plaintiffs who were students in Kitcho's classroom never learned of the abuse of their child/ward from Kings, but rather were informed only by the attorney for the citizen activist who forced the disclosure of the records.

*Effects of abuse on Plaintiffs*

148.    A teacher aide in Kitcho's classroom declared that "the verbal abuse . . . was continuous."  She added that when Kitcho abused a child, "everybody else is listening in the room . . . the other kids aren't doing anything but listening."

149.    Due to the physical and emotional abuse imposed upon H.M. by Kitcho, H.M significantly regressed in a number of important life-controlling areas including, but not limited to, speech and toileting.  As a result of being in Kitcho's class, H.M. began having toileting accidents and then was required to wear pull-ups.

150.     In addition, H.M. began having night terrors and migraine headaches due to the abusive actions of Kitcho.  Hannah woke up screaming and sweating in the middle of the night. This behavior continued for more than two years after Hannah attended Kitcho's class.

151.    In her parents' words, H.M. began the 2010-2011 school year as a "bubbly little spunky girl who loved school and loved to talk and sing, play babies and be on the phone.  And what I got during and at the end of the school year was a quiet, withdrawn, regressed little girl who had given up on everything in her life that she loved."  Defendants never informed M.M. and A.M. about the physical and emotional abuse imposed upon H.M. by Kitcho.

152.    Defendants lied to M.M. and A.M. about how Kitcho treated H.M.  Kitcho made H.M.'s parents think H.M. was to blame for the downturn in her life.

153.    H.M. came home from school one day with a very bad bruise on her face but Kitcho provided no information in response to A.M.'s inquiry.

154.    During the 2010-2011 school year, M.M. and A.M. believed H.M. was suffering and regressing as a result of her disability and that H.M.'s life might be nearing its end.  During

that time, H.M. would just lie in her mother's arms and stare into space. M.M. and A.M. now know that H.M. suffered and regressed as a result of Defendants' conduct.

155. H.M. still will not speak about her horrific experience in Kitcho's classroom.

156. H.M. did not speak when she attended a different school in another state after she left Kitcho and Kings.

157. H.M., M.M. and A.M. each suffered severe emotional distress proximately caused by Defendants' unlawful conduct punishing and abusing H.M. H.M. further suffered physical injury caused by Defendants' conduct. H.M. suffers post-traumatic stress disorder as a consequence of Defendants' conduct.

158. H.M. has been formally diagnosed as having Post Traumatic Stress Disorder.

159. As a result of Kitcho's abuse of the multi-handicapped Plaintiff children and her abuse other students in the classroom, each of the Plaintiff children suffered physical pain, acute and chronic emotional distress, and psychological damage proximately caused by the Defendants' conduct.

160. As a result of the abuse by Kitcho towards their child/ward, each of the parents and guardians who are Plaintiffs herein suffered acute and chronic emotional distress and psychological damage proximately caused by the Defendants' conduct.

*Kings/Kitcho Actions and Inactions*

161. Kings did not properly train and supervise Kitcho to teach the Plaintiff children.

162. Kitcho punished the Plaintiffs who were students in her classroom because of their disabilities and, in effect, did nothing but inflict unnecessary and unjustifiable pain and injury on them.

163. Defendants did not have a functional understanding of H.M.'s CDG 1a or the strengths and weaknesses of the other Plaintiffs who were students in Kitcho's classroom.

164. Defendants exposed H.M. and the other Plaintiff children to repeated aversive interventions without the expressed written consent of H.M.'s parents and the other Plaintiff parents and guardians. Kings' failure to properly train and supervise Kitcho was a gross deviation from accepted practices for caring for multi-handicapped students.

165. Defendants did not base their use of aversive interventions against H.M. and the other Plaintiff children upon any professionally acceptable practices. Instead, they intentionally exacerbated H.M.'s and the other Plaintiff children's anxiety and fear.

166. Defendants did not document their use of aversive interventions against H.M.

167. Despite all the prior warnings about Kitcho, Kings failed to adequately address and stop Kitcho's injurious conduct against any of the Plaintiffs who were students in Kitcho's classroom

168. As noted above, in 2012, under threat of public exposure, Kings finally conducted an investigation into Kitcho's abusive conduct. Kings placed Kitcho on administrative leave with full pay and benefits until August 2012. Kings agreed with Kitcho that it would represent that its investigation "revealed no wrongdoing on her [Kitcho's] part." Kings misrepresented the true reason why Kitcho was placed on administrative leave with salary and benefits. Kings provided a favorable employment reference for Kitcho and otherwise covered up how it had abused H.M.

169. Kings instructed its employees to refrain from discussing Kitcho's conduct.

170.     In fact, the librarian at Columbia stated that she was "receiving all kinds of 'threatening' innuendos from my employers."  Additionally, the librarian was expressly told by Defendant Detmer-Bogaert to "essentially keep [her] mouth shut."

171.     Kings intended that its investigation remain private and unknown to M.M. and A.M., the other Plaintiff parents and guardians, and all other interested parties.  Kings' legal counsel stated Kings' interest in keeping Kitcho's conduct under wraps "instead of making them [investigatory records] public to protect everyone involved" and attempting to maintain confidentiality so "they don't become public records which is also very important."  In response to the question from a Kings' employee "So they are trying not to be public records?" Kings' legal counsel responded: "Right."

172.     The parents of the Plaintiffs who were students in Kitcho's classroom, *i.e.*, M.M. and A.M, R.P. and J.P.; M.J., J.A. and M.A., and L.W., did not learn until mid-2013, after third parties had filed a successful public records lawsuit against Kings, that Defendants Kitcho, Gasper, Detmer-Bogaert and Kings had secretly deprived the Plaintiff children of their constitutional and other federal and state rights and otherwise knowingly abused them.

173.     Legal counsel for Kings conceded in a publicly disclosed legal memorandum that Kitcho could be found to have created "a climate of hostility and intimidation in her classroom."

**FIRST CAUSE OF ACTION**
**DENIAL OF H.M.'S FOURTH AMENDMENT RIGHT (UNREASONABLE SEIZURE)**

174.     Plaintiffs incorporate by reference the preceding paragraphs of this Complaint

175.     H.M., like all United States citizens, has a constitutional right to be free from unreasonable seizures.

176.     Kitcho, Defendant principals, and Kings deprived H.M. of her constitutional right to be free from unreasonable seizure by, solely as a form of punishment, taping H.M. into a

chair, by forcing her to crawl on the floor, and by secluding her in the bathroom and the "janitor's hallway" on multiple occasions.  Kitcho acted unlawfully and the Defendant principals acquiesced as supervisors and final policymakers for Kings.

177.    As a direct and proximate result of the violation of H.M.'s constitutional rights, H.M. has suffered damages.

## SECOND CAUSE OF ACTION
## DENIAL OF H.M.'S FOURTH AMENDMENT RIGHT (EXCESSIVE FORCE)

178.    Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

179.    H.M., like all United States citizens, has a constitutional right to be free from the use of excessive force

180.    Kitcho, the Defendant principals, and Kings deprived H.M. of her constitutional right to be free from the use of excessive force by taping H.M. into a chair.  Kitcho acted unlawfully and the Defendant principals acquiesced as supervisors and final policymakers for Kings.

181.    As a direct and proximate result of the violation of H.M.'s constitutional rights, H.M. has suffered damages.

## THIRD CAUSE OF ACTION
## DENIAL OF PLAINTIFF CHILDREN'S 14TH AMENDMENT RIGHT
## (SUBSTANTIVE DUE PROCESS)

182.    Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

183.    H.M., like all United States citizens, has the substantive due process constitutional right to personal security and bodily integrity.

184.    H.M. and all the Plaintiff children also have the substantive due process constitutional right to be free from arbitrary government conduct that lacks all socially redeeming value.

185.    The relationship between each Plaintiff child and the Defendants was not voluntary.  Each Plaintiff child was required by law to attend Kings' schools, in general, and Kitcho's class, in particular.

186.    Kitcho and the other Defendants had a significant period of time for deliberation to choose their conduct that is challenged in this case.

187.    None of the Defendants was pursuing any legitimate governmental purpose by verbally and physically intimidating, harassing, and abusing the Plaintiff children.

188.    Kitcho, the Defendant principals, and Kings deprived H.M. and all the Plaintiff children of their constitutional right to substantive due process by engaging in arbitrary actions and omissions towards each of them that was of such an extreme nature as to shock the conscience.  Kitcho acted unlawfully and the Defendant principals acquiesced as supervisors and final policymakers for Kings.

189.    As a direct and proximate result of the Defendants' violation of each Plaintiff child's constitutional rights, each Plaintiff child has suffered damages.

**FOURTH CAUSE OF ACTION**
**DENIAL OF PLAINTIFFS' 14TH AMENDMENT RIGHT**
**(EQUAL PROTECTION OF THE LAW)**

190.    Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

191.    The Plaintiff children and their parents and guardians, like all United States citizens, have the right to equal protection of the laws.

192.    Without any lawful basis, each Defendant treated the Plaintiffs differently than they treated typically developing children and the parents and guardians of typically developing children.

193. Both with regard to how they abusively and with deliberate indifference treated the Plaintiff children as described in this Complaint, and how they refused to provide notice of that abusive treatment to the Plaintiff parents and guardians and attempted to cover-up, the Defendants had no lawful basis whatsoever.

194. Upon information and belief, the Plaintiffs allege that the Defendants had a pattern and practice of treating multi-handicapped students and their families differently than typically developing children and their families.

195. Defendants' intentional disparate treatment of the Plaintiffs violated the Plaintiffs' right to equal protection of the laws.

## FIFTH CAUSE OF ACTION
## DELIBERATE INDIFFERENCE TO TRAINING AND RATIFICATION

196. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

197. Kings was deliberately indifferent to the Plaintiff children's constitutional and other rights by failing to promulgate a policy to properly train Kitcho and other employees to prevent her unconstitutional, unlawful, and tortious mistreatment of the children. Among other deficiencies, Kings failed to train its employees to report child abuse to the appropriate authorities. In fact, after Kitcho's abuse and Kings' and its employees' failure to report it, law enforcement officials required that Kings conduct training. Kings has a history of knowingly failing its multi-handicapped students in different ways including the failure to train its employees to report child abuse. There is an obvious need to train employees how to avoid abusing multi-handicapped children and to report abuse when it occurs. Kings' pattern and practice of failing to safeguard multi-handicapped children was known to its policymakers yet they failed to act until required to do so by law enforcement authorities.

198.    Kings has a policy and practice of neglecting the civil rights of multi-handicapped students attending its schools and reportedly retaliates when families advocate for their multi-handicapped children.

199.    Kings either knew or should have known that Kitcho mistreated the Plaintiff children and despite having that knowledge Kings failed to act.

200.    Kings had a practice or custom reflecting deliberate indifference to the mistreatment of multi-handicapped children.

201.    As a direct and proximate result of the deliberate indifference to training relative to the Plaintiff children's constitutional and other rights, the children's rights were violated and the children have suffered damages.

**SIXTH CAUSE OF ACTION**
**SECTION 504 OF THE REHABILITATION ACT OF 1973 (29 U.S.C. 794)**
**AND THE AMERICANS WITH DISABILITIES ACT**

202.    Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

203.    Kings receives federal funds.

204.    Kings knows that multi-handicapped children like the Plaintiff children require highly specialized instruction and have a legal entitlement to equal access to a public education. Notwithstanding that knowledge, Kings, with deliberate indifference, deprived the children of those rights and discriminated against them, children with disabilities, based solely on those disabilities.

205.    Kings does not duct-tape typically developing children to chairs and seclude them in bathrooms.  Kings does not force typically developing children to crawl on the floor into bathrooms.  Kings does not treat typically developing children in any manner similar to how it treats multi-handicapped children including the Plaintiff children in this matter.

206.     Kings' conduct deprived the Plaintiff children of meaningful access to or benefit from their public education.

## SEVENTH CAUSE OF ACTION
## <u>INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS</u>

207.     Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

208.     The foregoing actions and omissions of the Defendants towards the Plaintiffs were outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and are regarded as atrocious and utterly intolerable in a civilized community.

209.     The foregoing actions and omissions of the Defendants towards the Plaintiffs were intentional or reckless.

210.     Defendants intended to cause Plaintiffs severe emotional distress and/or acted with reckless disregard as to the risk that their actions or omissions would cause Plaintiffs severe emotional distress.

211.     The foregoing actions and omissions of the Defendants towards the Plaintiffs were extreme and outrageous.

212.     The foregoing actions and omissions of the Defendants towards the Plaintiffs caused Plaintiffs to suffer severe emotional distress beyond that which a reasonable person should be expected to endure.

213.     As a direct and proximate cause of the foregoing actions and omissions of the Defendants towards the Plaintiffs, Plaintiffs have suffered damages.

## EIGHTH CAUSE OF ACTION
## <u>ASSAULT</u>

214.     Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

215. Kitcho acted with the intent to create a state of fear or danger of harm or offensive contact in the Plaintiff children.

216. The children had a reasonable belief that they would be subject to harm or offensive contact by Kitcho.

217. The children experienced fear of such harm or offensive contact in response to Kitcho's conduct.

218. Kitcho's conduct towards the children was harmful and offensive.

219. As a direct and proximate cause of the foregoing actions by Kitcho towards the Plaintiff children, the children have suffered damages.

**NINTH CAUSE OF ACTION**
**BATTERY**

220. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

221. Upon information and belief, in her actions towards the Plaintiff children, Kitcho engaged in the intentional touching of or application of force to their bodies and did so in a harmful or offensive manner, and without consent.

222. As a direct and proximate cause of the foregoing actions of Kitcho towards the Plaintiff children, the children have suffered damages.

**TENTH CAUSE OF ACTION**
**NEGLIGENCE *PER SE***

223. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

224. Ohio Revised Code § 2151.421 specifically mandates that the Defendants were to report Kitcho's conduct to the appropriate authorities.

225. Defendants intentionally and recklessly failed to timely report Kitcho's conduct to the appropriate authorities.

226. R.C. 2151.421 imposed that specific and mandatory reporting duty on the Defendants for the safety and protection of the Plaintiffs.

227. The Defendants intentionally and recklessly failed to comply with the mandates of R.C. 2151.421.

228. As a direct and proximate cause of the Defendants' intentional and reckless violation of R.C. 2151.421, the Plaintiff children have suffered the type of injuries the statute was designed to protect against.

229. The Defendants' violation of R.C. 2151.421 is a misdemeanor of the first degree.

230. The Defendants' intentional and reckless violation of R.C. 2151.421 constitutes negligence *per se*.

## ELEVENTH CAUSE OF ACTION
## LOSS OF CONSORTIUM

231. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

232. As a direct and proximate result of the conduct of the Defendants, M.M. and A.M., as the parents and guardians of H.M., R.P. and J. P. as the parents and guardians of S.P., M.J., as the guardian of M.J., J.A. and M.A., as the parents and guardians of D.A., and L.W. as the guardian of J.K. have been damaged due to the deprivation of the services, society, companionship, comfort, love, solace and affection of their respective children and are entitled to recover for their loss of consortium in an amount to be determined at trial.

**WHEREFORE,** Plaintiffs pray that judgment be entered in their favor against the Defendants and that the Court award:

M.M. and A.M., individually and on behalf of their minor child H.M., H.M., R.P. and J. P. as the parents and guardians of S.P., M.J., as the guardian of M.J., J.A. and M.A., as the parents and guardians of D.A., and L.W. as the guardian of J.K. compensatory monetary

damages in an amount to be determined at trial, including compensatory monetary damages for physical injuries and extreme emotional distress, together with punitive monetary damages, caused by the Defendants' violent, abusive, deliberately indifferent, recklessly and intentional unlawful conduct, and an award of reasonable costs and attorney fees, and such other relief to which Plaintiffs may be entitled in law or in equity.

Respectfully Submitted,

/s/ Curt C. Hartman

Curt C. Hartman, Esq. (0064242)

Christopher P. Finney, Esq. (0038998)   THE LAW FIRM OF CURT C. HARTMAN
FINNEY LAW FIRM, LLC                    3749 Fox Point Court
4270 Ivy Pointe Boulevard, Ste. 225     Amelia, OH 45102
Cincinnati, OH 45245                    (513) 752-2878
(513) 943-6665                          hartmanlawfirm@fuse.net
(513) 9413-6669 (fax)
Chris@FinneyLawFirm.com                 and

                                        Richard Ganulin, Esq. (0025642)
                                        3662 Kendall Avenue
                                        Cincinnati, OH 45208
                                        (513) 405-6696
                                        rganulin@gmail.com

                                        *Attorneys for Plaintiffs*